## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brian P. Nustad, Colleen S. Nustad
and Dru B. Nustad,

      Plaintiffs,

v.

Carver County, Carver County
Sheriff's Department, Deputy
Christopher Curtis, Deputy Timothy
Gerber, Deputy Michael Miller,
Sheriff Byron Olson, Individually and
in their Official capacities,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-526 (MJD/SER)

_____

      Dennis J. Holisak, Dennis J. Holisak Law Offices, Counsel for Plaintiffs.

      Jason M. Hiveley and Amanda L. Stubson, Iverson Reuvers Condon,
Counsel for Defendants.

_____

      This matter is before the Court on Plaintiffs' motion for partial summary

judgment and Defendants' motion for dismissal and/or summary judgment.

## I.    Background

### A.    Juvenile Runaway Incident

On July 29, 2009, Corporal Michael Wollin of the Carver County Sheriff's Department was dispatched to investigate a report of a juvenile threatening another juvenile named Dan Egesdal. (Ex. A (Deposition of Michael Wollin, Ex. 1).)  While en route, Wollin passed a white Mitsubishi that he knew was frequently driven by Plaintiff Dru Nustad, parked near Egesdal's home. (Id.)

Also at that time, the Sheriff's Department was looking for a juvenile runaway, Nick Johnson, who had been reported a runaway on July 7, 2009.  (Id.) Wollin had also been informed that Egesdal may have information about Johnson, and that Dru Nustad was also a friend of Johnson.  (Id.)

Wollin stopped by Dru's vehicle and noticed two other young men in his car.  (Id.)  Wollin asked Dru about Johnson, to which Dru responded that he did not know where Johnson was at the time.  (Id.)  The two passengers in Dru's car identified themselves as Adam Loge and Devin Kleven.  Wollin then gave Dru permission to leave.  (Id.)

Later that evening, it was determined that the young man who identified himself as Devin Kleven was actually Nick Johnson.  (Id.)  Wollin drove to the Plaintiffs' residence and spoke with Dru's father, Brian Nustad, who told Wollin that Dru was not at home.  (Id.)

2

One week later, on August 5, 2009, Deputies Timothy Gerber and

Christopher Curtis went to the Plaintiffs' home after they had received

information earlier in the day that Nick Johnson was again with Dru.  (Ex. C

(Curtis Dep. Ex. 5).)  The parties dispute what exactly happened during this visit.

Defendants assert that upon approaching the home, Gerber ran into Plaintiff

Colleen Nustad, who was in the front yard with her dog.  (Id.)  Gerber asked

Colleen about Nick Johnson and whether he could talk with Dru.  (Id.)  Colleen

responded that she would not allow Gerber to speak with Dru, and that Johnson

was not in her home.  (Id.)  Gerber then informed Colleen that it was a crime to

harbor a juvenile runaway and Colleen turned and went into the house,

slamming the door.  (Id.)  Gerber and Curtis walked to the road and watched the

Plaintiffs' residence.  (Id.)  A short while later, Brian and Dru Nustad were

observed leaving the house from a side door.  (Id.)

Gerber asserts that Brian Nustad approached them, shining a large

flashlight on them.  (Id.)  He then told the deputies to leave, as they were

disturbing their family.  (Id.)  Dru then asked if the deputies had something

better to do than look for a runaway.  (Id.)  The deputies informed them that

harboring a runaway was a crime, and then left, as Brian Nustad was becoming

argumentative.  (Id.)

Colleen Nustad contends that she was in her front yard with her dog, when she was startled by Gerber and Curtis. (Ex. E (Deposition of Colleen Nustad at 17).)  She asserts that a deputy shone a bright flashlight in her eyes while asking if Dru was home and whether Nick Johnson was with him.  (Id. at 18.)  She asked the deputy to quit shining the flashlight in her eyes, but he refused and kept asking her about Nick Johnson.  (Id.)  Colleen informed them that she did not know where Johnson was, and that she would not let the deputies search her home.  (Id.)  She then went into the house to wake up her husband.  (Id.)  She was screaming as she went into the house, waking both her husband and son.  (Id.)  Brian Nustad then ran into the garage to grab a flashlight, and when he came around the house, he saw one of the deputies standing on the running board of his truck, and leaning inside the truck through an open window.  (Id. at 19-20; (Ex. F (Deposition of Brian Nustad at 38).)  Brian demanded that the deputies leave his private property, and told them repeatedly that they did not know where Nick Johnson was.  (Ex. F (B. Nustad Dep. at 31).)  Brian claimed that he was very scared, as the deputies were threatening them with felony charges if they refused to provide consent to search their home.  (Id.

at 33.)

Later that day, Brian Nustad sent an email to Carver County

Commissioner Tom Workman about his family's encounter with Deputies Curtis

and Gerber.  (Ex. L (Deposition of Thomas Workman, Ex. 1).)  Workman

forwarded the email to Sheriff Byron Olson, Lieutenant Jim Olson and the mayor

of Chanhassen.  (Id.)  Brian subsequently communicated with Lt. Olson who was

conducting an investigation into Brian's complaint.  (Ex. M (Deposition of Lt.

James Olson at 8-9.)  Lt. Olson also spoke with Deputies Gerber and Curtis about

the August 5, 2009 incident at Plaintiffs' home.  (Id. at 13.)  Ultimately, Curtis was

not disciplined, and Gerber was placed on a performance improvement plan.  (Id.

at 16.)

Dru was thereafter charged with a felony offense of contributing to a child

being a runaway.  (Ex. G.)  The summons and complaint were sent to Plaintiffs'

residence at 7791 Erie Avenue.  Unbeknownst to law enforcement, Plaintiffs did

not receive mail at their home; instead they had a post office box.  (See Ex. H.)  As

a result, Dru did not receive a copy of the summons and complaint and failed to

make his initial appearance.  As a result, a bench warrant was issued for his

arrest. (Id.)

On October 1, 2009, Wollin was on patrol when he passed Dru driving a white Mitsubishi.  (Id.)  Knowing there was an outstanding warrant on Dru, Wollin turned his vehicle around and began to follow him.  When Dru pulled into his cousin's driveway, Wollin stopped and approached him.  Wollin asked Dru if he was aware there was a warrant for his arrest.  Dru responded that he did not and that he had not received anything in the mail.  Wollin then showed him a copy of the warrant, placed him under arrest and transported him to jail. (Id.)

Ultimately, Dru entered a plea of guilty to the count of depravation of parental rights and to the added charge of public nuisance.  He received a stay of adjudication on the first charge, a stay of imposition on the public nuisance charge, was issued a fine, community service and was ordered to have no contact with the runaway.  (Ex. G.)

### B.    Motor Vehicle Tampering Incident

At midnight on September 24, 2010, Chanhassen Community Service Officer and firefighter Matthew Jackson was on his way home after responding to a fire call.  (Ex. I (Deposition of Matthew Jackson at 11-12).)  As he pulled into his parking lot, Jackson observed a white male teenager walking close to the cars

and looking into the car windows.  (Id. at 12.)  When Jackson parked his car and

got out, the teenager stood up, saw Jackson and started walking away.  (Id.)

Jackson then went to his apartment, grabbed his portable radio and badge and

jacket, and went back into the parking lot.  (Id.)  He saw the male at the other end

of the lot, but the male quickly left and Jackson lost sight of him.  (Id. at 16.)

Jackson then used his radio to request assistance and informed any

available deputies that he had observed a white male wearing blue jeans and a

grey hoodie looking into cars in the parking lot, and that the male ran westbound

when he saw Jackson.  (Ex. J (Kittelson Report).)  Several deputies responded,

including Curtis.  (Id.)  These deputies were nearby due to extra patrol in the

downtown area because over a dozen burglaries and attempted burglaries had

taken place in that area in the last 24 hours.  (Id.)

Curtis soon located an individual walking eastbound on Del Rio Drive,

across Laredo Drive, that matched the description given by Jackson of the

individual looking into cars.  (Plaintiffs' Ex. 2 (Curtis Incident Report.)  Curtis

stopped his squad car and told the individual, who was identified as Dru

Nustad, to stop walking and to get on the ground.  (Id.)  Dru complied and

Curtis placed Dru in handcuffs.  (Id.)  Dru asked what he did wrong, and told

7

Curtis he was simply walking from his house to the nearby elementary school to retrieve his car.  (Id.)  Curtis noted in his report that the school parking lot was directly south of the apartment complex in question, and that Dru was walking in the opposite direction of the school parking lot when he was stopped.  (Id.)

Dru was told to sit on the curb while they waited for Jackson to arrive at the scene to determine whether Dru was the person Jackson saw in the parking lot looking into cars.  (Id.; Ex. I (Jackson Dep. at 22).)  Jackson positively identified Dru as the individual he had seen looking into cars.  (Jackson Dep. at 23.)  Dru was then placed in a squad car.  (Plaintiffs' Ex. 2.)  Curtis spoke with Jackson at that point, and asked him what he saw.  (Id.)  Jackson replied that he witnessed Dru looking into every car window, and that he would cup his hands around his eyes to see into the dark vehicles.  (Id.)  Curtis made contact with one car owner whose car was parked in the lot at issue.  Curtis asked the owner to determine whether anything was missing, and the owner informed him that nothing was missing.  (Id.)  Curtis discussed the situation with Corporal Robbins and Sgt. Kittelson, after which it was determined that Dru would receive a citation for tampering with a motor vehicle based on Jackson's report that Dru was cupping his hands around his fact to see into the dark vehicles.  (Id.)  After

8

approximately 40 minutes, Dru was cited for motor vehicle tampering and released.  (Id.; Ex. B (Deposition of Dru Nustad at 52).)

It is Dru's contention that on the evening of September 23, 2010, he had parked his car at the Chanhassen elementary school to meet a friend who lived nearby.  (Ex. B (D. Nustad Dep. at 42).) When he returned to his car about 9:00 p.m., there was an unusual amount of police activity near his car.  Because of the harassment that he had been experiencing by the police of late, discussed below, Dru decided to walk home and retrieve his car later.  (Id. at 44.)  In the early morning hours of September 24, 2010, Dru claims he was on his way to pick up his car when he noticed Jackson in the parking lot of an apartment building.  (Id. at 48-49.)  Dru also noticed a number of squad cars, so he turned around and began to walk home.  (Id. at 51.)   On the way home, however, he was stopped by Deputy Curtis.  (Id.)

Brian Nustad contacted Lt. Olson about the vehicle tampering citation issued to Dru, and Olson met with the Plaintiffs on September 28, 2010.  (Id. at 40.)  Two days later, Colleen Nustad was out running when she observed Jackson outside his apartment building.  (Ex. E (C. Nustad Dep. at 34) Ex. D (Curtis Dep. Ex. 7).)  She called out, asking if he was Matt Jackson, to which he responded that

9

he was and he approached her on the street.  (Id. at 34-35.)  She then asked

Jackson if he was the one who had accused her son of vehicle tampering, and

asked him about what he saw the evening of September 24, 2010.  (Id. at 35.)

Jackson told her that he did not want to talk about it, but Colleen pressed him.

(Id.)  Jackson told her again that he would not talk about the incident, and

Colleen responded that he better get his ducks in a row for trial.  (Id.)

Jackson later talked with Curtis about his conversation with Colleen

Nustad.  (Ex. I (Jackson Dep. at 26).)  Thereafter, Deputies Curtis and Miller

visited Plaintiffs' residence because of their concern that Colleen Nustad's

conversation with Jackson was inappropriate as Jackson was a witness to a crime

for which formal charges were pending against Dru Nustad.  (Ex. D (Curtis Dep.

at 35, 37-38).)  When they approached Plaintiffs' home, Brian and Colleen were

outside with a group of friends.  (Id. at 35-36.)  Curtis asked to speak with

Colleen.  (Id. at 36.)  Colleen and Brian then spoke with the deputies on their

front step.  Curtis attempted to tell Colleen the concerns they had about her

conversation with Jackson, and that they were there to get her side of the story.

(Ex. N.)  Plaintiffs became agitated and asked the deputies to leave their home,

which they did.  (Id.)

After this incident, Brian Nustad again contacted Lt. Olson about the meeting with Curtis and Miller and his concerns about the citation for tampering with a motor vehicle.  (Ex. M (Olson Dep. at 37).)  After this meeting, Olson talked with Sheriff Byron Olson, who requested that Plaintiffs' concerns be forwarded to Commander Jeff Enevold.  (Id. at 39.)  Neither Deputy Curtis or Miller was disciplined as a result of this complaint.  (Ex. D (Curtis Dep. at 6-7); Ex. K (Miller Dep. at 5).)

### C.    Other Contacts with Law Enforcement

Dru Nustad has alleged that he was followed by law enforcement on four other occasions:

October 2009 - Dru claims he was followed to the Chanhassen Target store, and as he was walking into the store, a deputy drove his vehicle up to him and drove slowly and parallel with him, while "eyeing" him.

November 24, 2009 - Dru was driving in Chanhassen when an unidentified deputy began following him.  The deputy followed him to a gas station, watched him enter and exit the store, and then followed him as he drove away.

Summer 2010 - Dru was stopped by Deputy Blatzheim after Dru and a friend had left another friend's house after curfew.  The deputy claimed that Dru

had a taillight out.  After checking Dru's and his passenger's identification,

Blatzheim learned that the friend was out past curfew.  Blatzheim then took the

passenger home.  Dru was not cited for a broken taillight.

November 2010 - Dru claims he was followed by unnamed deputies while

pumping gas.

Finally, Plaintiffs claim that law enforcement conspicuously drove by their

residence on eleven occasions in October and November 2009.

### D.    Claims

In the Amended Complaint, Plaintiffs have asserted the following claims:

Count I, False Arrest on September 24, 2010; Count II, malicious prosecution

concerning the motor vehicle tampering citation; Count III, intentional infliction

of emotional distress; Count IV, violation of 42 U.S.C. § 1983; Count V, failure to

prevent a § 1983 violation; Count VI, Monell Claim; Count VII, Punitive damages.

Defendants have moved to dismiss certain claims and for summary

judgment on the remaining claims.  Plaintiffs have moved for partial summary

judgment as to the claim for malicious prosecution and false

arrest/imprisonment.

## II.      Standard for Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may

move the Court to dismiss a claim if, on the pleadings, a party has failed to state a

claim upon which relief may be granted.  In reviewing a motion to dismiss, the

Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d

842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to state a claim to relief that is plausible on its
> face.  Thus, although a complaint need not include detailed factual
> allegations, a plaintiff's obligation to provide the grounds of his
> entitlement to relief requires more than labels and conclusions, and a
> formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

### A.      Carver County Sheriff not a Suable Entity

Defendants first move to dismiss the Carver County Sheriff's Department

as a named defendant, as it is not a legal entity subject to suit.  Plaintiffs have

agreed to dismiss the Carver County Sheriff's Department as a defendant. (Doc.

No. 34 at 10.)  The Court will thus grant the motion.

### B.      Claims under the Minnesota Constitution

Defendants move to dismiss any claims arising under the Minnesota

Constitution.  Plaintiffs respond they are not asserting any claims under the

Minnesota Constitution.  (Doc. No. 34 at 10.)  Based upon Plaintiffs'

representations, this motion will be dismissed as moot.

### C.   Claims under Minn. Stat. § 609.748

Defendants also move to dismiss any claims that Defendants engaged in

harassment as defined in Minn. Stat. § 609.748, as that statute does not provide

for a private cause of action.  Plaintiffs respond that they are not asserting a cause

of action under § 609.748.  (Doc. No. 34 at 11.)  Again, based on Plaintiffs'

representations, this motion will be dismissed as moot.

### D.   Section 1983 Claims

Defendants argue that Plaintiffs' § 1983 claims are insufficiently pled, as

they are generally alleged against all County Defendants and not tied to specific

conduct that amounts to a constitutional violation.  See Liggins v. Morris, 749 F.

Supp. 967, 971 (D. Minn. 1990) (dismissing § 1983 claims that were generally

asserted by all plaintiffs against all defendants).

Plaintiffs respond that they have alleged in their complaint that Deputies

Curtis and Gerber performed a warrantless search of Brian Nustad's truck on

August 5, 2009, and that Deputy Curtis violated Dru Nustad's Fourth

Amendment rights by performing a false arrest and false imprisonment on

September 24, 2010.  Plaintiffs further allege that Sheriff Byron Olson was on

notice that Carver County deputies were violating Plaintiffs' constitutional rights,

and that his failure to train or to take action allowed such violations to take place.

The Court finds that Plaintiffs have included sufficient allegations in the

Second Amended Complaint against the named defendants that identify the

specific bases for the § 1983 claims asserted against each of them.  Accordingly,

the Court will deny Defendants' motion to dismiss the § 1983 claims pursuant to

Fed. R. Civ. P. 12(b)(6).

## III.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### A.    Section 1983 "Failure to Prevent" Claims and Claims Against Sheriff Byron Olson in his Individual Capacity

Defendants argue that the § 1983 claim asserted against Sheriff Olson in his

individual capacity must be dismissed as there is no evidence that Sheriff Olson

participated or was otherwise involved in any of the alleged constitutional

violations.  In addition, the claim of failure to prevent a constitutional violation

must also be dismissed in the absence of evidence that Sheriff Olson personally

violated Plaintiffs' constitutional rights.

"Section 1983 liability cannot attach to a supervisor merely because a

subordinate violated someone's constitutional rights."  Otey v. Marshall, 121 F.3d

1150, 1155 (8th Cir. 1997).  A supervisor is liable for a subordinate's

"constitutional violation only 'if he directly participated in the constitutional

violation, or if his failure to train or supervise the offending actor caused the

deprivation. . . .'"  Id. (citing Tilson v. Forrest City Police Dep't, 28 F.3d 802, 806

(8th Cir. 1994)).  For a supervisor to be liable for failure to train or supervise, a

plaintiff must show that the supervisor "1) Received notice of a pattern of

unconstitutional acts committed by subordinates; (2) Demonstrated deliberate

indifference to or tacit authorization of the offensive acts; (3) Failed to take

sufficient remedial action; and (4) That such failure proximately caused injury to

[plaintiff]." Id. (quoting Jane Doe A. v. Special Sch. Dist. of St. Louis County, 901

F.2d 642, 645 (8th Cir. 1990)).

Plaintiffs argue that there is evidence to support a claim against Sheriff

Olson because he was on notice that his deputies had harassed the Plaintiffs and

had violated the Plaintiffs' constitutional rights, as demonstrated through emails,

newspaper articles, and a meeting with Lt. Olson after Dru had been cited for

vehicle tampering.  Despite being on such notice, Sheriff Olson did nothing to

investigate the conduct of his deputies or take other steps to stop the deputies

from engaging in such unlawful conduct.

The Court finds that Plaintiffs have failed to demonstrate genuine issues of

material fact on the issue of whether Sheriff Olson was on notice that deputies

were engaging in harassing conduct and were violating Plaintiffs' constitutional

rights.  The email communication referenced by Plaintiffs was sent on August 5,

2009 and discusses only one incident - the incident in the early morning hours of

August 5, 2009 at the Plaintiffs' home.  (Plaintiffs' Ex. 19.)  The email was

forwarded to Sheriff Olson and Lt. Jim Olson, and Sheriff Olson responded that

he would look into the Plaintiffs' concerns.  (Ex. M (Workman Dep. Ex. 1.)  Lt.

Jim Olson did conduct an investigation, and ultimately Deputy Gerber was

placed on a performance improvement plan.  (Plaintiffs' Ex. 21 (Lt. Olson Dep. at

14-16).)

Plaintiffs also reference an op-ed piece that Colleen Nustad wrote that

appeared in the Chanhassen Villager on December 17, 2009 which discussed the

felony charge against her son for contributing to a runaway.  (Ex. E (C. Nustad

Dep. at 56).)  There is no evidence that Sheriff Olson was made aware of this op-

ed piece, but even if he did, there is no indication that the op-ed piece discussed

continued harassment by the deputies.  (Ex. F (B. Nustad Dep. at 52 (discussing

fact that op-ed piece only mentions the July 2009 incident)).)

Finally, Plaintiffs reference the fact that Lt. Olson met with the Plaintiffs

after Dru was cited for tampering with a vehicle in September 2010.  At this

meeting, Plaintiffs and a number of neighbors informed Lt. Olson of the alleged

harassment of the Plaintiffs by Carver County Deputies.  However, as that

meeting took place after the alleged harassment had occurred, evidence of the

meeting does not support Plaintiffs' claims that Sheriff Olson had notice of the

harassment and that his failure to act allowed the harassment to continue and

damage Plaintiffs as a result.  Accordingly, the Court finds that summary

judgment is appropriate as against Sheriff Byron Olson.

## B.    Qualified Immunity

When bringing a § 1983 claim, a plaintiff must establish (1) that he was

deprived of a right secured by the Constitution or laws of the United States and

(2) that the deprivation was committed under color of state law.  Lugar v.

Edmondson Oil Co., 457 U.S. 922, 931 (1982).  "Qualified immunity protects a

government official from liability in a section 1983 action unless the official's

conduct violated a clearly established constitutional or statutory right of which a

reasonable person would have known."  Henderson v. Munn, 439 F.3d 497, 501

(8th Cir. 2006) (citations omitted).  "The purpose of qualified immunity is to

allow public officers to carry out their duties as they believe are correct and

consistent with good public policy, rather than acting out of fear for their own

personal financial well being."  Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)

(citation omitted).

To determine whether officers are entitled to qualified immunity, the Court

must consider whether the officers violated a constitutional or statutory right and

whether such right was clearly established at the time of the alleged violation.
Saucier v. Katz, 533 U.S. 194, 201 (1985).  "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law.  But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."  Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994) (citations omitted).

"To determine whether a right is clearly established we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008) (quoting Clemmons v. Armontrout, 477 F.3d 962, 965 (8th Cir. 2007)).  "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'"  Wilson v. Layne, 526 U.S. 603, 614 (1999).

As discussed below, the Court finds that the individual defendants are entitled to qualified immunity because Plaintiffs have failed to demonstrate that Deputies Curtis, Gerber or Miller violated a clearly established statutory or constitutional right.

### 1.      Search of Nustad's Property

Plaintiffs assert their Fourth Amendment rights were violated when Deputies Curtis and Gerber visited Plaintiffs' home on August 5, 2009 in search of a juvenile runaway.  "The standard for determining when the search of an area surrounding a residence violates fourth amendment guarantees no longer depends on outmoded property concepts, but whether [plaintiff] has a legitimate expectation of privacy in that area." United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (finding that plaintiff did not have a legitimate expectation of privacy in driveway or yard that was subject to public view); United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) (same); see also United States v. Robbins, 682 F.3d 1111, 1115 (8th Cir. 2012) (finding that officers acting in furtherance of a legitimate law enforcement objective may approach a private home from the driveway and through an open gate to the front door without intruding on constitutional rights).

It is Plaintiffs' position that on the evening of August 5, 2009, one of the deputies approached Colleen Nustad from the street, while the other deputy approached her from the bushes on the side of her home.  The Court finds that there is no evidence in the record to support this assertion, however.  In her deposition, Colleen Nustad explained that the deputies came at her very quickly,

21

but did not state that one came from the bushes at the side of her home.  (See Ex.

E (C. Nustad Dep. at 17).)  Deputy Curtis testified that he "walked up with

Deputy Gerber.  I stood by the corner of the residence, near the garage, and

Deputy Gerber went towards the front door."  (Ex. D (Curtis Dep. at 25).)

Deputy Gerber testified that he and Curtis approached the house from the road,

and that they had agreed that Gerber would make contact with Plaintiffs at the

front door and that Curtis would watch the back yard.  (Ex. C (Gerber Dep. at 9).)

When he was walking toward the front door, he came upon Colleen Nustad.  (Id.

at 10.)  Because there is no evidence in the record that Deputies Curtis or Gerber

entered Plaintiffs' property from a protected curtilage, the Court finds that Curtis

and Gerber did not violate the Fourth Amendment rights of Plaintiffs by entering

their driveway and yard for purposes of looking for a juvenile runaway.

## 2.   Warrantless Vehicle Search

Plaintiffs further allege their Fourth Amendment rights were violated

when Curtis stood on the running board of Brian Nustad's truck and looked

inside.  Assuming such a search took place, Defendants argue it did not amount

to a constitutional violation because Plaintiffs did not have a reasonable

expectation of privacy to a truck parked in the driveway, subject to public view,

with the windows rolled down.  Further, Defendants assert that Curtis and

Gerber had probable cause to believe the juvenile runaway was on Plaintiffs'

property.

Whether the deputies violated Plaintiffs' Fourth Amendment rights by

searching Brian Nustad's truck depends on whether Plaintiffs had a legitimate

expectation of privacy with respect to the truck at that time.  See United States v.

Marquez, 605 F.3d 604, 609-10 (8th Cir. 2010) (finding that the defendant did not

have reasonable expectation of privacy in his movements in a car that travels on

the public streets); see also United States v. Manning, No. 1:06-00010, 2007 WL

1656223, at *8 (D. Tenn. June 7, 2007) (no legitimate expectation of privacy in car

parked on driveway subject to public view, allowing officers to walk by or look

into car).

Based on the record before it, and viewing those facts in the light most

favorable to Plaintiffs, the Court finds that Plaintiffs have failed to demonstrate

that the alleged search of the truck violated the Fourth Amendment.  The

deputies had information that the runaway was seen previously in Dru Nustad's

car, and that the juvenile, at that time, may be with Dru.  Under these

circumstances, Deputy Curtis did not violate the Fourth Amendment by looking

into the truck, as the truck was not parked within the Plaintiffs' protected

curtilage and the windows were open.

### 3.     Investigatory Stop of Dru Nustad

Plaintiffs have also alleged that Dru Nustad's constitutional rights were

violated on September 24, 2010 when he was stopped and later cited for motor

vehicle tampering.  Defendants assert that the stop of Dru Nustad did not violate

his Fourth Amendment rights as the stop was based on a reasonable, articulable

suspicion of criminal activity, and because the stop was not excessively intrusive

in scope or in execution.

Law enforcement may conduct a brief, investigatory stop of an individual if

the officer has a reasonable, articulable suspicion that criminal activity is afoot.

Illinois v. Ardlow, 528 U.S. 119, 123 (2000).  "The existence of reasonable,

articulable suspicion is determined by the totality of the circumstances, taking into

account an officer's deductions and rational inferences resulting from relevant

training and experience."  United States v. Horton, 611 F.3d 936, 940 (8th Cir.

2010) (citing United States v. Arvizu, 534 U.S. 266, 273–74 (2002)).  "A stop

typically is justified when a suspect matches the description of a person involved

in a disturbance near in time and location to the stop."  Id.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Deputy Curtis had a reasonable, articulable suspicion to stop Dru Nustad shortly after midnight on September 24, 2010 based on Jackson's report and request for assistance concerning a possible crime of motor vehicle tampering in an apartment parking lot.

While Plaintiffs challenge the basis for the stop - arguing that there was no justification to stop Dru in the first place as Jackson never saw the suspect trying get into any of the cars - the inquiry is not what Jackson observed, but what Deputy Curtis was told over the radio, as Curtis was the individual that stopped Dru Nustad.  The evidence demonstrates that Jackson radioed that a white male was observed looking into cars, and had run away when he saw Jackson, providing a reasonable, articulable suspicion supporting the stop of Dru Nustad. (See Ex. J.)

Plaintiffs further argue that the stop turned into an unlawful arrest when Dru was handcuffed and detained for approximately 40 minutes, where the evidence did not support probable cause that Dru had committed a crime.

A stop initially supported by a reasonable, articulable suspicion may nonetheless violate the Fourth Amendment if it was excessively intrusive in its

25

scope or manner of execution.  <u>El-Ghazzawy v. Berthiamume</u>, 636 F.3d 452, 457

(8th Cir. 2011).   For example, an investigatory stop may become a de facto arrest

if it lasts for an unreasonably long time.  <u>United States v. Sharpe</u>, 470 U.S. 675, 685

(1985).  In determining whether the stop was "reasonable and thus in keeping

with characterization of this encounter as an investigative stop" the Court should

keep in mind the following factors:

> the number of officers and police cars involved, the nature of the crime and
> whether there is reason to believe the suspect might be armed, the strength
> of the officers' articulable, objective suspicions, the erratic behavior of or
> suspicious movements by the persons under observation, and the need for
> immediate action by the officers and lack of opportunity for them to have
> made the stop in less threatening circumstances.

<u>United States v. Saffeels</u>, 982 F.2d 1199, 1206 (8th Cir. 1992) <u>judgment vacated on

other grounds</u> 510 U.S. 801 (1993) (quoting <u>United States v. Jones</u>, 759 F.2d 914,

916-17 (8th Cir. 1968)).

First, Plaintiffs assert that seven deputies responded to Jackson's report of a

possible crime of vehicle tampering.  Given the fact that the only thing Jackson

saw was a teenager looking into cars, the response to his report was excessive.

Defendants have presented undisputed evidence, however, that extra patrol was

in the area that night because of a number of burglaries and attempted burglaries,

26

over a dozen, in the past 24 hours.  (Ex. J.)  Therefore, the fact that seven deputies

responded to Jackson's radio call does not establish that the scope of the stop was

excessive.

Plaintiffs further argue the fact that Dru was handcuffed and detained for

approximately forty minutes demonstrates that he was placed under arrest.

With respect to the duration of the stop, "there is no rigid time limit on an

investigatory detention."  United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005)

(citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).  "In determining whether

a period of time is excessive, we must consider the "law enforcement purposes to

be served by the stop as well as the time reasonably needed to effectuate those

purposes." Id.  The Eighth Circuit previously held that a 45 minute stop was

reasonable, as that was a reasonable amount of time to complete the identity

check and other aspects of the traffic stop.  United States v. Sanchez, 417 F.3d 971,

975 (8th Cir. 2005).

In this case, Defendants have presented evidence that the length of the stop

was necessary to allow the deputies to conduct a limited investigation into the

reported criminal activity.  Specifically, to allow Jackson to identify whether Dru

was the person he saw looking into cars and to determine whether any cars had,

in fact, been broken into.  Accordingly, the Court finds that the duration of the

stop in this case does not warrant a finding that Dru was, in fact, placed under

arrest.

The law also provides that an officer may handcuff an individual during an

investigative stop to maintain the status quo while obtaining more information.

United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006).  "However, the use of

handcuffs is greater than a de minimus intrusion and thus requires the [officer] to

demonstrate that the facts available to the officer would warrant a man of

reasonable caution in the belief that the action taken was appropriate." El-

Ghazzawy, 636 F.3d at 457 (quoting Lundstrom v. Romero, 616 F.3d 1108, 1122

(10th Cir. 2010) (internal quotation marks and citation omitted).

Defendants assert that placing Dru Nustad in handcuffs was warranted in

order to maintain the status quo as he was suspected of theft at a time when there

had been a string of burglaries in the area in the past 24 hours.  In addition, Dru

was reported to have run from the parking lot upon seeing Jackson.  Therefore,

placing Dru in handcuffs was a reasonable response to the belief that he may flee.

Finally, Dru's statement that he was walking to his car raised suspicion as he was

walking in the direction opposite to where his car was parked when he was

stopped.  Based on the above, the Court finds that by placing Dru Nustad in handcuffs, Deputy Curtis did not transform an investigative stop into a de facto arrest.

### 4.    Equal Protection Violation

Finally, Plaintiffs allege Dru's right to equal protection was violated when he was charged in 2009 with contributing to a child being a runaway, but that others involved in the underlying conduct were not similarly charged.  Dru claims he was similarly situated to the passengers in his vehicle because they all lied about the location of the runaway.  Plaintiffs concede that Dru was the only one in the car that could have been charged under Minn. Stat. § 609.26, subd. 1(8) - as he was on the only one 18 years or older.  Plaintiffs argue, however, that Dru was the only one charged with a public nuisance crime, which does not have an age requirement.  By only charging Dru with a public nuisance crime, a pattern of disregard for Dru's constitutional rights began.

The Court finds that Plaintiffs' equal protection claim must fail.  Not only are juveniles not similarly situated to adults with respect to charging decisions, the charging decision in this case was made by an Assistant Carver County Attorney, not the Carver County deputies alleged to have engaged in a pattern of

disregard for Plaintiffs' constitutional rights.

### C.      Official Capacity and Monell Claims

An official capacity suit is merely a suit against a government entity or municipality.  A municipality may be liable under § 1983 only if the government body itself subjects a person to a deprivation of rights or causes a person to be subjected to such a deprivation.  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citing Monell v. New York City Dept. Of Soc. Servs., 436 U.S. 658, 692 (1978)).  To impose liability on a municipality, a plaintiff must prove that action or conduct pursuant to official municipal policy caused his/her injury.  Id.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Id.

Because the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact that their constitutional rights were violated, Defendants are entitled to summary judgment on this claim as well.

### D.      Intentional Tort Claims

#### 1.      Intentional Infliction of Emotional Distress

The elements of an intentional infliction of emotional distress ("IIED")
claim are: "(1) the conduct must be extreme and outrageous; (2) the conduct must
be intentional or reckless; (3) it must cause emotional distress; and (4) the distress
must be severe." Hubbard v. United Press Intern. Inc., 330 N.W.2d 428, 438
(Minn. 1983).  In addition, the type of conduct actionable under IIED is that which
is "so atrocious that it passes the boundaries of decency and is utterly intolerable
to the civilized community." Id.  "The operation of this tort is sharply limited to
cases involving particularly egregious facts." Id.

Minnesota courts have set a very high bar for IIED claims.  For example,
evidence that an employer made false police reports, repeatedly threatened an
employee with legal action and frequently engaged an employee in loud
workplace arguments was held to be not so egregious as to support a claim for
IIED. Langeslag v. KYMN, Inc., 664 N.W.2d 860, 865 (Minn. 2003).

Based on this high standard, the Court finds that Plaintiffs failed to
establish that Defendants engaged in conduct sufficiently outrageous to support a
claim for IIED.

### 2.  False Arrest

The elements of a false arrest claim are: "(1) an arrest performed by

defendant, and (2) the unlawfulness of such arrest." Shqeirat v. U.S. Airways Group, Inc., 515 F. Supp. 2d 984, 999 (D. Minn. 2007).  The Court finds that this claim fails as the Court has determined that as a matter of law, Plaintiffs have failed to demonstrate that Dru was placed under arrest on the night of September 24, 2010.

### 3.   Malicious Prosecution

Plaintiffs further assert that the motor vehicle tampering citation is evidence that Dru was subjected to malicious prosecution, as probable cause did not exist at the time he was issued a citation, nor did the individual defendants act with a reasonable belief that probable cause existed.  Plaintiffs further claim that there is evidence that Defendants targeted and harassed the Plaintiffs, and that such evidence further demonstrates that the officers that arrested him acted with malice when they issued him the motor vehicle tampering citation.

The elements of a claim for malicious prosecution include: "(1) the action was brought without probable cause or reasonable belief that the plaintiff would ultimately prevail on the merits; (2) the action must be instituted and prosecuted with malicious intent; and (3) the action must terminate in favor of [appellant]." Dunham v. Roer, 708 N.W.2d 552, 569 (Minn. Ct. App. 2006).

Defendants argue that they are entitled to summary judgment on this claim pursuant to the doctrine of official immunity.  "The common law doctrine of official immunity provides that a public official who is charged by law with duties calling for the exercise of judgment or discretion is not personally liable to an individual for damages unless the official is guilty of a willful or malicious act. Official immunity thus protects government officials from suit for discretionary acts taken in the course of their official duties.  The doctrine is designed to protect officials from 'the fear of personal liability that might deter independent action.'" Huttner v. State, 637 N.W.2d 278, 284 (Minn. Ct. App. 2001).

Defendants assert that issuing citations is a discretionary act.  Plaintiffs do not argue otherwise.  Accordingly, official immunity applies in this case, unless Plaintiffs can show that Defendants acted willfully or maliciously.  See Elwood v. Rice County, 423 N.W.2d 671, 679 (Minn. 1988).  "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited."  Kelly v. City of Minneapolis, 598 N.W.2d 657, 663 (Minn. 1999).  Defendants argue that the record does not support a finding that any of the Defendants intentionally acted with reason to believe their conduct was legally prohibited.

The Court finds that the individual defendants are entitled to official immunity with respect to the claim for malicious prosecution, as the record does not support a finding that they acted out of ill will or malice.  That is, the record does not support a finding that Deputy Curtis, Corporal Robbins or Sgt. Kittelson knew that issuing Dru a citation, under the circumstances known to them at the time, was legally prohibited.  On the night in question, Defendants had responded to a call of an individual possibly tampering with motor vehicles, and stopped Dru as he matched the description of the possible suspect and he was in the vicinity of the possible vehicle tampering.  In addition, when stopped, he was walking in the direction opposite his car, yet he told Deputy Curtis that he was going to get his car.  Finally, Dru was positively identified as the individual Jackson saw looking into every car window in the parking lot, and cupping his hands to look into the darkened cars.  Viewing these facts in the light most favorable to Plaintiffs, the Court finds that no reasonable juror could find that the Defendants were acting with bad faith or malicious intent when the decision was made to issue a citation to Dru for motor vehicle tampering.  See Elwood 423 N.W.2d at 679 (a reasonable, but mistaken, belief that police action was necessary is not evidence of bad faith or malice).

Because the Court finds that the individual defendants are entitled to official immunity, Carver County is entitled to vicarious official immunity. Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 316 (Minn. 1998).

**IT IS HEREBY ORDERED:**

1.      Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 13] is

**DENIED**; and

2.      Defendants' Motion to Dismiss and/or Summary Judgment [Doc. No. 26] is **GRANTED**.  This matter is hereby dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date: October 25, 2013

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court

Civil No. 12-526